IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MICHELLE L. W.,[1]
    Plaintiff,

    v.                                                  Civil No. 3:20CV210 (REP)

COMMISSIONER OF SOCIAL SECURITY,
    Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying the application of Michelle L. W. ("Plaintiff") for disability insurance benefits under the Social Security Act. Plaintiff, thirty-nine years old at the time of her benefits application, graduated from high school, completed some college courses, and previously worked in various clerical and human resources positions. (R. at 34, 68-71, 208.) Plaintiff asserts that she is disabled because she suffers from obesity, degenerative disc disease, post laminectomy syndrome, migraines, major depressive disorder, anxiety, post-traumatic stress disorder ("PTSD"), personality disorder, bipolar disorder, panic disorder, and medication/opiate addiction. (R. at 19, 79.)

On December 8, 2016, Plaintiff applied for disability insurance benefits. (R. at 16.) After Plaintiff's application was denied, and after exhausting her administrative remedies, Plaintiff now seeks judicial review of the Administrative Law Judge's ("ALJ") decision pursuant to 42 U.S.C. § 405(g).

---

[1]     The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties cross-motions for summary judgment, rendering the matter ripe for review.[2] Plaintiff raises one argument, asserting that the ALJ failed to provide sufficient reasons supported by substantial evidence for according less than controlling weight to the opinion of one of Plaintiff's treating physicians, Ramesh Koduri, M.D. (Pl.'s Brief in Supp. of Mot. For Summ. J. 5, ECF No. 20 ("Pl.'s Mem.").) For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 19) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 21) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On December 8, 2016, Plaintiff filed an application for disability insurance benefits, with an alleged onset date of January 1, 2013. (R. at 16.) Plaintiff's claim was denied on March 30, 2017, and again upon reconsideration on October 18, 2017. (R. at 16.) At Plaintiff's request, the ALJ held a hearing on August 20, 2018 during which Plaintiff, represented by counsel, and a vocational expert, testified. (R. at 16, 44.) On December 4, 2018, the ALJ issued a written opinion denying Plaintiff's disability claim. (R. at 16-35.) The ALJ concluded that Plaintiff did not qualify as disabled because Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. at 35.) The Social Security Administration Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision, rendering the ALJ's decision as the final

---

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

decision of the Commission subject to review by this Court. (R. at 2-4.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II. FACTUAL BACKGROUND

In rendering the decision to deny Plaintiff's disability claim, the ALJ considered the following relevant evidence.

### A. Plaintiff's Background.

Plaintiff, who was thirty-nine years old at the time of her benefits application, previously worked in various clerical and human resources positions. (R. at 68-71.) She maintained substantial gainful employment from 1993 to 2013. (R. at 18-19, 68-69.) Plaintiff worked as an office manager in a doctor's office from 2008 to 2011 until her mental health conditions worsened after the sudden death of her son. (R. at 52-53.) Plaintiff's only work since that time has been short term or intermittent temporary positions, the latest of which occurred in 2015. (R. at 18, 69-70.)

### B. Medical Evidence.

#### 1. Mental Impairments.

In September 2008, Plaintiff began seeing Dr. Ravinder Mamedi, M.D., for treatment of depression and panic disorder. (R. at 263.) On March 5, 2010, Dr. Mamedi noted that Plaintiff was maintaining employment and had reentered the dating scene. (R. at 257.) Following the sudden death of her son in May 2011, Dr. Mamedi added "bereavement" to Plaintiff's list of diagnoses, and, despite continued depression, Dr. Mamedi noted that Plaintiff had no suicidal ideations. (R. at 249-52.)

On December 4, 2011, several months after her son's death, Plaintiff reported to Southside Regional Medical Center Emergency Room with severe depression and suicidal statements. (R. at

333.) Plaintiff was transferred from the Emergency Room to the Behavioral Health Unit where Plaintiff received in-patient therapy for three days. (R. at 322-33.)

In October of 2013, Plaintiff was treated by Dr. Ramesh Koduri, a psychiatrist. (R. at 55, 547-61.) On October 14, 2013, Dr. Koduri reported that Plaintiff "does not report feeling better," has "[n]o job no funds," "self-esteem low," is "bored," is "facing same every day," has "applied for 100 jobs [but] no takers," and is "taking college course." (R. at 548.) Dr. Koduri diagnosed Plaintiff with PTSD, prescribed Seroquel and Xanax, and found Plaintiff's overall condition to be "not stable." (R. at 548.)

On December 8, 2013, Plaintiff was again admitted to the Behavioral Health Unit at the Southern Virginia Regional Medical Center, due to significant depression and suicidal thoughts. (R. at 633-34.) Plaintiff appeared disheveled and unkempt, and was "med seeking." (R. at 634.) Plaintiff was started back on Seroquel, Cymbalta, and Xanax. (R. at 640.) Two days following her admission to the Behavioral Health Unit, Plaintiff was noted to be "alert, communicative and rational"; was mildly depressed, not suicidal, and not delusional; and her "cognitive functions were intact." (R. at 640.) Her treating physician noted that her mood and behavior had improved with therapy and discharged Plaintiff with instructions to regularly receive psychiatric treatment. (R. at 640-41.)

On February 11, 2014, Dr. Koduri completed a mental residual functional capacity assessment ("the 2014 Assessment") of Plaintiff. (R. at 649-51.) Dr Koduri checked "markedly limited" for the following areas: the ability to remember locations and work-like procedures; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary practices; the ability to work in coordination with others without being distanced by them; the ability to complete a normal workday and work week without interruptions from

4

psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to accept instructions and respond appropriately to criticism from supervisors. (R. at 649-50.)

On July 25, 2016, Plaintiff began seeing Dr. Prakash B. Karn, M.D., a psychiatrist, at Virginia South Psychiatric & Family Services. (R. at 1043.) At this initial visit, Dr. Karn denied Plaintiff's request for Adderall and diagnosed her with bipolar disorder, borderline personality disorder, panic disorder, and PTSD. (R. at 1043-45.) On October 25, 2016, Dr. Karn noted that Plaintiff reported improvement in anxiety, no depression, and a good energy level. (R. at 1041.) Plaintiff arrived for her next visit with Dr. Karn on January 24, 2017, appearing sedated and complaining of back pain. (R. at 1039.) When prompted for a urine sample, Plaintiff reportedly threw the urine sample in the trash and was observed taking "a handful of pills." (R. at 1039, 1053.) Plaintiff allegedly passed out in Dr. Karn's waiting room and, due to overdose concerns, was taken to the Emergency Room at Southern Virginia Regional Medical Center. (R. at 1039, 1053.) Plaintiff's progress notes from her admission state that Plaintiff appeared awake, alert, disheveled, and cooperative with treatment. (R. at 1050.) Plaintiff's examining physician concluded that Plaintiff suffered from recurrent major depression. (R. at 1050-51.) On January 25, 2017, Plaintiff was released from the hospital against medical advice. (R. at 1143-46.)

Following this incident, Plaintiff resumed treatment with Dr. Karn. (R. at 1037.) On November 14, 2017, the most recent appointment available in the record, Dr. Karn noted that Plaintiff reported feeling better, Plaintiff's depression and sleep were improved, and Plaintiff's "energy level is good." (R. at 1175-77.)

2. Physical Impairments.

In addition to her mental impairments, Plaintiff also suffers from degenerative disc disease in her back, which produces pain in her neck and back. (R. at 19, 983-86.) Beginning in 2011, Plaintiff began conservative treatment for her pain, including physical therapy, chiropractic management, pain medication, and injections. (R. at 392-409.) After worsening pain, Plaintiff underwent surgery in February 2015, which initially improved her symptoms, but some discomfort returned a few months after the surgery. (R. at 514-24, 721, 733, 756-98.)

**C. Plaintiff's Testimony.**

At the August 2018 hearing with the ALJ, Plaintiff testified that her mental health severely declined following the death of her son in 2011. (R. at 54-56.) She stated that she developed "severe" PTSD and experienced a worsening of anxiety and depression symptoms. (R. at 54-56.) Plaintiff testified that her grief and declining mental state resulted in the termination of her employment as an office manager at a doctor's office. (R. at 52-53.) Plaintiff characterized the dissolution of her employment as a "mutual agreement" between herself and her employer. (R. at 53.) Plaintiff testified that she began seeing a therapist three times per week after the loss of her son, and, in December 2011, she checked herself into Southside Regional Medical Center at the insistence of her daughter and best friend. (R. at 55-56.)

Plaintiff testified that she continues to experience PTSD "flashbacks" and panic attacks. (R. at 54-55.) Plaintiff also stated that she has "deep depression days" about seven to eight times per month where she lies in bed, cries all day, and may not shower for a span of five to seven days. (R. at 57-58.) Plaintiff reported that she takes Klonopin, which helps alleviate her depression symptoms, and Seroquel, which helps her fall asleep at night. (R. at 56-57.)

Plaintiff testified that she had worked various human resources and clerical positions from the age of sixteen, except a four-year period during which she focused on raising her children. (R. at 71, 73.) After Plaintiff ceased working as an office manager in 2011, she obtained some temporary work in the years that followed. (R. at 69.)

Plaintiff reported difficulty working in human resources and clerical positions because of pain in her shoulder blades after "sitting in front of a computer all day long." (R. at 71.) Plaintiff doubts her ability to work full-time in any position because of her back pain, PTSD, depression, and anxiety. (R. at 54.)

**D. Vocational Expert's Testimony.**

After hearing testimony from Plaintiff, the ALJ examined a vocational expert. (R. at 68-75.) The ALJ presented a hypothetical individual who shared the same age, education, and past jobs as Plaintiff, and who is limited to lifting five pounds frequently and ten pounds occasionally; sitting six out of an eight-hour workday; standing and walking two hours out of an eight-hour workday; interacting only occasionally with peers, public, and supervisors; working at a slow pace with no assembly line work; and being off task ten percent of the time, absent twelve days of work per year, and requiring one ten-minute break every two hours. (R. at 74.) The vocational expert testified that such an individual could not perform Plaintiff's office manager position, but the individual could perform jobs that exist in significant numbers in the national economy, such as addresser or credit clerk. (R. at 74-75.)

### III. THE ALJ'S DECISION

Following the evidentiary hearing, the ALJ issued a written opinion on December 4, 2018, concluding that Plaintiff did not qualify as disabled and denying her benefits. (R. at 16-35.) The ALJ followed the five-step evaluation process established by the Social Security Act to determine whether disability exists. (R. 18-35); 20 C.F.R. § 404.1520(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015) (describing the five-step sequential evaluation).

According to those regulations, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's medical impairments meet or equal an impairment in the Listings.[3] § 404.1520(a)(4)(iii); *see* 20 C.F.R Pt. 404, Subpt. P, App. 1. Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1520(e), 404.1545(a)(1). At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

In the instant case, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2013, which is the alleged onset date of her impairments. (R. at 18.) At step two, the ALJ concluded that Plaintiff suffers from obesity, degenerative disc disease, post laminectomy syndrome, migraines, depression, anxiety, PTSD,

---

[3] The Listings are a regulatory appendix of "the major body systems impairments that [the Social Security Administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity." § 404.1525(a).

8

personality disorder, bipolar disorder, panic disorder, and medication/opiate addiction—all of which significantly limit Plaintiff's ability to perform basic work activities. (R. at 19.)

At step three, the ALJ determined that none of Plaintiff's impairments, individually or in combination, met or equaled a disability listing in the Listings, located at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) Specifically, the ALJ held that Plaintiff's impairments did not meet or equal Listings 1.04 for disorders of the spine; 11.02 for epilepsy (headaches); 12.04 for depressive, bipolar, and related disorders; 12.06 for anxiety and obsessive-compulsive disorders; 12.08 for personality disorders; and 12.15 for trauma- and stressor-related disorders. (R. at 19.)

In concluding Plaintiff's impairments did not meet any of the Listings, the ALJ explained that Plaintiff has a moderate limitation in understanding, remembering, or applying information. (R. at 20.) The ALJ explained that Plaintiff applied for 100 jobs and took an online college course in 2013; worked in 2013, 2014, and 2015; had a job interview in 2016; and is able to clean, wash dishes, and cook. (R. at 20.) The ALJ further cited the opinion of treating psychiatrist Dr. Karn, who found that Plaintiff's "cognitive functioning, memory, and speech were normal." (R. at 20.)

The ALJ also determined that Plaintiff has a moderate limitation in concentrating, persisting, or maintaining pace for the same reasons that Plaintiff has a moderate limitation in understanding, remembering, or applying information. (R. at 20-21.) Additionally, the ALJ noted that Plaintiff was "awake, alert, and oriented to person, place, and time around the time of the alleged onset date, and her speech, memory, intelligence, and higher cortical functions appeared normal." (R. at 21.) The ALJ found that Plaintiff "followed along at the hearing and answered all questions." (R. at 21.) The ALJ further relied on Dr. Karn's observation that Plaintiff "was not distractable." (R. at 21.)

The ALJ further determined that Plaintiff has a moderate limitation in interacting with others. (R. at 20.) The ALJ noted Plaintiff's temporary exacerbation in mental health symptoms during the application period. (R. at 20.) However, the ALJ considered that Plaintiff responded positively to treatment and "was generally alert, oriented, and cooperative with no delusions in her treatment records." (R. at 20.) The ALJ also cited the opinion of Dr. Karn, who determined Plaintiff's "appearance, grooming, and speech were normal and her judgment was not impaired." (R. at 20.)

Finally, the ALJ determined that Plaintiff has a moderate limitation in adapting or managing herself because Plaintiff testified that she is "fairly active around the house" and is "able to do daily tasks." (R. at 21.) The ALJ additionally relied on Dr. Karn's medical opinion and Plaintiff's admission that "her depression was under control in March 2013." (R. at 21.)

After step three, the ALJ determined that Plaintiff has the residual functional capacity to perform "medium" work with the following limitations:

> She can sit for six out of eight hours and stand and walk for two out of eight hours. She is limited to no negotiation of ladders, rope, and scaffolding. She can occasionally crawl, crouch, bend, stoop, kneel, and climb steps and ramps. She requires a sit/stand option for two minutes twice an hour in place and a ten-minute break every two hours. She is limited to simple and routine tasks. She is limited to occasional use of a walker to ambulate over uneven surfaces. She can occasionally interact with peers, the public, and supervisors with minimal supervision after 30 days. She is limited to a slow pace with no assembly line work. She would be off task for ten percent of the time, and she would miss 12 days of work a year.

(R. at 22.)

In explaining the residual functional capacity determination, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 29.) Regarding Plaintiff's mental symptoms specifically, the ALJ found Plaintiff to be "awake, alert, and oriented to person, place, and time around the time of the alleged onset date, and her speech,

10

memory, intelligence, and higher cortical functions appeared normal." (R. at 30.) The ALJ identified Plaintiff's failure to receive sustained mental health treatment during the relevant period and pointed to her medication-seeking behavior. (R. at 30.) Although the ALJ acknowledged that Plaintiff was admitted to the hospital for "exacerbations in her mental health" three separate times during the relevant period, the ALJ noted that, each time, Plaintiff responded well to treatment. (R. at 30.)

The ALJ also concluded that Plaintiff "engaged in a range of daily activities during the relevant period that do not support allegations of disabling symptoms in limitations." (R. at 30.) The ALJ noted that Plaintiff applied for 100 jobs and completed a college course in October 2013, received some earnings from 2013 through 2015, and interviewed for a job in May 2016. (R. at 31.) The ALJ additionally relied on Plaintiff's testimony that she can lift ten to fifteen pounds, sit for thirty minutes at a time, clean and wash dishes, and cook while seated. (R. at 31.)

The ALJ then considered the medical opinion evidence and assigned weight to each opinion. (R. at 31-33.) At issue in this appeal is the 2014 Assessment completed by Dr. Koduri, in which he opined that Plaintiff has marked limitations in certain areas of understanding and memory, sustained concentration and persistence, and social interaction, which would preclude work activity. (R. at 649-51.) The ALJ gave Dr. Koduri's opinion little weight, explaining:

> Though Dr. Koduri had a treating relationship with the claimant, he did not support this opinion with objective clinical or diagnostic findings. In addition, his opinion is inconsistent with his treatment records indicating that the claimant had applied for 100 jobs and was taking an online college course. His opinion is also [inconsistent[4]] with Dr. Karn's subsequent observations that the claimant's

---

[4]   As written, the ALJ's opinion states that Dr. Koduri's opinion is "also *consistent*" with Dr. Karn's observations. (R. at 32-33 (emphasis added).) However, read in context and having considered the substance of Dr. Karn's observations (which are in fact inconsistent with Dr. Koduri's opinion), the ALJ's use of "consistent" appears to be a typographical error. Considering the ALJ's thorough consideration of the record, specifically in relation to the treatment by Drs. Karn and Dr. Koduri, the apparent typographical error does not warrant remand.

11

appearance, grooming, cognitive functioning, memory, and speech were normal, she was not distractable, and her judgment was not impaired as well as with the claimant's favorable response to treatment within the relevant period, as discussed previously.

(R. at 32-33 (internal citations omitted).)

At step four, the ALJ concluded that Plaintiff is unable to perform past relevant work. (R. at 33.)

At step five, the ALJ held that there were jobs that existed in significant numbers in the national economy for Plaintiff to perform. (R. at 34-35.) The ALJ agreed with the vocational expert's testimony that Plaintiff could work as an addresser or credit clerk. (R. at 35.) The ALJ therefore concluded that Plaintiff was not disabled under the Act. (R. at 35.)

## IV. STANDARD OF REVIEW

This Court upholds an ALJ's Social Security disability determination if "(1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020) (citing 42 U.S.C. § 405(g) and *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015)).

"Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Pearson*, 810 F.3d at 207 (internal quotation marks omitted). Substantial evidence thus requires more than a scintilla of evidence, but less than a preponderance of the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Between these two evidentiary thresholds lies a "zone of choice" where the ALJ's decision can go either way without interference by the courts. *See Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir. 1988)). "'In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment' for the ALJ's." *Arakas*, 983 F.3d at 95 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).

# V. ANALYSIS

In her appeal to this Court, Plaintiff argues that the ALJ erroneously evaluated the opinion of Dr. Koduri, one of Plaintiff's treating physicians. (Pl.'s Mem. at 6-11.) Specifically, Plaintiff asserts that the ALJ's rationale for rejecting Dr. Koduri's opinions is conclusory and not supported by substantial evidence. (Pl.'s Mem. at 8-11.) Defendant counters that substantial evidence supports the ALJ's evaluation of Dr. Koduri's opinion. (Def.'s Mot. For Summ. J. and Br. in Supp. Thereof 18-23, ECF No. 21 ("Def.'s Mem.").) Defendant notes that Dr. Koduri's opinion is solely presented in a checkbox form, arguing that such conclusory opinions have limited probative value. (Def.'s Mem. at 18.) Defendant also maintains the ALJ appropriately discounted Dr. Koduri's opinion as inconsistent with his own treatment records, Plaintiff's testimony, and other medical evidence in the record. (Def.'s Mem. at 19-21.) For the reasons set forth below, the Court finds that the ALJ did not err in assigning Dr. Koduri's medical opinion less than controlling weight.

In evaluating medical opinions, an ALJ generally gives more weight to the opinions of treating physicians, in part, because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. § 404.1527(c)(2). Accordingly, when analyzing medical opinions, a treating physician's opinion must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "not inconsistent with the other substantial evidence." *Id.*; *see Arakas*, 983 F.3d at 106; SSR 96-2p, 1996 WL 374188 (July 2, 1996).[5] If an ALJ does not give the treating physician's opinion controlling weight, the ALJ must determine the appropriate

---

[5] Effective March 27, 2017, the Social Security Administration rescinded SSR 96-2p and what is known as the "treating physician rule." 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her application for benefits in December 2016, before the Social Security Administration rescinded the rule. (R. at 16.) Thus, this Court applies the prior regulation—the treating physician rule—to analyze Plaintiff's arguments as to Dr. Koduri's opinion.

weight based on the following factors: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors brought to the ALJ's attention which tend to support or contradict the medical opinion. § 404.1527(c)(2)–(6); *see Arakas*, 983 F.3d at 106.

Generally, a reviewing court should not disturb an ALJ's decision regarding the weight given to a medical opinion "absent some indication that the ALJ has 'dredged up specious inconsistences,' or *has failed to give a sufficient reason for the weight afforded a particular opinion*." *Dunn*, 607 F. App'x at 267 (emphasis added) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). The Court requires a "specific explanation of the ALJ's reasons for the differing weights he assign[s] various medical opinions" so the Court "can undertake meaningful substantial-evidence review." *Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016). "[T]he ALJ must *both* identify evidence that supports his conclusion *and* 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quoting *Mascio*, 780 F.3d at 636).

In the instant case, prior to assigning weights to the opinion evidence, the ALJ reviewed the testimony of Plaintiff, including Plaintiff's reported daily activities; medical evidence, including records of Plaintiff's visits with various medical providers; and the opinion evidence rendered by treating or examining physicians. (R. at 22-31.) The ALJ then reviewed and considered Dr. Koduri's 2014 Assessment, which opined that Plaintiff was "markedly limited" in five categories, including the abilities to remember locations and work procedures, perform activities within a schedule and maintain regular attendance, work in coordination with others

without being distanced by them, complete a normal work day without interruptions from psychologically-based symptoms, and accept instructions and respond appropriately to criticism from supervisors. (R. at 32-33, 649-51.)

The ALJ assigned little weight to Dr. Koduri's 2014 Assessment, noting that Dr. Koduri's opinion was not supported by objective clinical or diagnostic findings and was inconsistent with the medical evidence of record. (R. at 32-33.) Specifically, the ALJ found the 2014 Assessment to be internally inconsistent with Dr. Koduri's own treatment notes. (R. at 32.) For example, on October 14, 2013, Dr. Koduri noted both that Plaintiff's condition mental health worsened, and that Plaintiff applied for 100 jobs and began taking a college course. (R. at 548.) Additionally, the ALJ noted that Dr. Koduri's opinion was inconsistent with Dr. Karn's observations and opinions regarding Plaintiff's appearance, cognitive functioning, and judgment. (R. at 32-33.) For example, Dr. Karn observed that "the [Plaintiff's] appearance, grooming, cognitive functioning, memory, and speech were normal, she was not distractable, and her judgment was not impaired." (R. at 32-33.) Finally, the ALJ noted the fact that Plaintiff had responded favorably to treatment. (R. at 33.)

The Court finds that the ALJ did not err in declining to assign controlling weight to Dr. Koduri's 2014 Assessment. The ALJ adequately explained his decision to give the 2014 Assessment less than controlling weight by pointing to categories of evidence in the record that contradicted Dr. Koduri's conclusions—specifically, Dr. Koduri's own treatment notes and Dr. Karn's opinions and observations. The ALJ extensively reviewed Dr. Karn's treatment of Plaintiff elsewhere in the ALJ's decision, and Dr. Karn's opinions are supported by the record, including treatment notes from multiple appointments with Plaintiff. (R. at 1037-45, 1175-83.) The ALJ also relied on Plaintiff's "favorable response to treatment," which was thoroughly discussed throughout the ALJ's opinion and is supported by the record. (R. at 33; *see* R. at 25, 27-28, 30.) For example,

the medical records from Plaintiff's admission to Southern Virginia Medical Center in December 2013 noted that Plaintiff's mood and behavior improved with therapy. (R. at 640-41.) In 2016, Dr. Karn similarly observed Plaintiff's improvement with anxiety, depression, and energy level following several months of treatment. (R. at 1041.) Treatment notes from Plaintiff's November 2017 appointment with Dr. Karn are also the most recent in the record, in which Dr. Karn noted further improvements for Plaintiff's depression and energy level. (R. at 1175-77.) For these reasons, the ALJ did not err in assigning less that controlling weight to Dr. Koduri's 2014 Assessment because it was "inconsistent with the other substantial evidence." § 404.1527(c)(2).

Finding that the ALJ adequately explained and supported the decision to assign less than controlling weight to Dr. Koduri's 2014 Assessment, the Court next turns to whether the ALJ adequately considered and explained each of the six factors relevant in assessing the weight of the 2014 Assessment. As discussed above, the ALJ meaningfully considered and discussed the supportability and consistency factors because the ALJ noted the 2014 Assessment's inconsistencies with the medical record, such as Dr. Karn's observations and Plaintiff's favorable response to treatment. The ALJ further noted that Plaintiff and Dr. Koduri had a sufficient "treating relationship",[6] and the ALJ noted Dr. Koduri's diagnoses and each course of treatment he recommended. (R. at 32, 25); *see* § 404.1527(c)(2) (describing the factors related to the treatment relationship). Although the ALJ does not extensively address each factor individually, the ALJ's opinion is sufficiently robust to make clear that each factor was considered. *See Dowling v.*

---

[6] The extent of treatment provided by Dr. Koduri is somewhat unclear, in that Defendant asserts that Plaintiff saw Dr. Koduri on only two occasions prior to his 2014 Assessment (Def.'s Mem. at 11, 13), while Plaintiff testified that, following the death of her son in May 2011, she went to Dr. Koduri's office for therapy treatment "every Monday, Wednesday and Friday," for an unknown period of time. (R. at 55.) The Court need not resolve this dispute, as the ALJ found a sufficient treatment relationship existed, and because the ALJ's assignment of weight did not turn on this factor.

16

*Comm'r of Soc. Sec. Admin.*, 986 F. 3d 377, 385 (4th Cir. 2021) (holding that it merely must be "apparent" that an ALJ meaningfully considered each factor, and that an ALJ is not required to "set forth a detailed factor-by-factor analysis"). Thus, the ALJ adequately considered the statutory factors and sufficiently explained the decision to assign Dr. Koduri's opinion "little" weight.

In sum, the ALJ adequately explained why the 2014 Assessment was inconsistent and unsupported by the evidence of record, including inconsistencies within Dr. Koduri's own treatment notes, thereby "build[ing] an accurate and logical bridge from the evidence to [the ALJ's] conclusion" and allowing the Court to evaluate the decision. *Monroe*, 826 F.3d at 189. Because the ALJ sufficiently explained the weight assigned to Dr. Koduri's 2014 Assessment and substantial evidence supports the weight assigned, the Court finds no error.

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 19) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 21) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/ *(signature)*
Elizabeth W. Hanes
United States Magistrate Judge

Richmond, Virginia
Date: June 29, 2021